1  Mark Epstein, Esq.        SBN: 159801
   Julia M. Adams, Esq.      SBN: 230795
2  **The Epstein Group**
   **Attorneys & Counselors at Law**
3  2358 Market Street, Third Floor
   San Francisco, California 94114
4  Telephone (415) 863-5718
   Facsimile (415) 863-8719
5  e-mail: mepstein@epsteingroup.com

6  Attorneys for Plaintiff
   JAMES WARD
7

8                UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11
   JAMES WARD,                     )  CASE NO.
12                                 )
         Plaintiff,                )  **COMPLAINT FOR DAMAGES AND**
13                                 )  **EQUITABLE RELIEF**
      vs.                          )  1.  RICO VIOLATION;
14                                 )  2.  INTENTIONAL
   NAVEEN CHANANA, SANJEEV TYAGI,  )  MISREPRESENTATION;
15 GAURAV GAUBA and DOE 1 through DOE )  3.  CONCEALMENT;
   20, inclusive,                  )  4.  FALSE PROMISE;
16                                 )  5.  NEGLIGENT
         Defendants.               )  MISREPRESENTATION; and
17                                 )  6.  CONSPIRACY.
                                   )
18 _____ )  **DEMAND FOR JURY TRIAL**

19

20      JAMES WARD ("WARD" OR "PLAINTIFF") alleges and complains against defendants,

21 and each and every one of them, as follows:

22                          **I. INTRODUCTION**

23      1.    PLAINTIFF brings this is as a civil action brought pursuant to the provisions of

24 the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961 et

25 seq. PLAINTIFF alleges herein that Defendants NAVEEN CHANANA, SANJEEV TYAGI,

26 GAURAV GAUBA, and DOES 1 through 20 (collectively referred to herein as

27 "DEFENDANTS") illegally and fraudulently procured visas for themselves and their family

28 members for the purpose of living in the United States to own and operate Softline Consulting &


The Epstein Group
Attorneys

Complaint

Integrators, Inc. ("SL") in pattern violation of the United States Penal Code. (18 U.S.C. § 1425, Procurement of Citizenship or Naturalization Unlawfully.) Further, after illegally and fraudulently obtaining visas, DEFENDANTS recruited PLAINTIFF to work for SL by promising PLAINTIFF that DEFENDANTS would publicly sell SL and PLAINTIFF would be substantially benefited financially. However, since DEFENDANTS engaged in pattern of illegal activity to be in the United States, DEFENDANTS could not have possibly taken SL to an initial public offering ("IPO") since such a move would be subject to due diligence from the investor community.

2. WARD seeks damages and other appropriate relief for defendants' RICO violations as alleged more fully below:

## II. JURISDICTION

**A.   PERSONAL JURISDICTION**

3. At all times material herein, DEFENDANTS were and are residents of the State of California.

**B.   FEDERAL QUESTION JURISDICTION**

4. This Court has subject matter jurisdiction of this case on the basis of federal question jurisdiction (28 U.S.C. section 1331) by virtue of PLAINTIFF's allegations that DEFENDANTS violated 18 U.S.C. section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO").

**C.   DIVERSITY JURISDICTION**

5. This Court has subject matter jurisdiction on the basis of diversity jurisdiction. (28 U.S.C. section 1332.)

6. PLAINTIFF is an individual and is currently a citizen and resident of the State of New Hampshire.

7. Each and every DEFENDANT is currently a resident of the State of California.

8. The amount in controversy exceeds $75,000.00.

**D.   VENUE**

9. This Court is the proper venue on the basis that a substantial part of the events and omissions giving rise to this claim occurred in this District. (28 U.S.C. section 1391(b)(2).)

### III. RICO PERSONS

### [18 U.S.C. SECTION 1961(3)]

10. PLAINTIFF WARD is a citizen and resident of New Hampshire and at all times material herein, was a citizen and resident of the State of California. PLAINTIFF was engaged in activities affecting federal interstate and/or foreign commerce. PLAINTIFF is a "person," as that term is defined pursuant to section 1961(3) of RICO. (18 U.S.C. section 1961(3).)

11. PLAINTIFF alleges that SL is and at all times material herein was, a corporation created and organized pursuant to the California Corporations Code, maintaining its principal place of business within the City of San Jose, County of Santa Clara, State of California. SL at all times material herein was engaged in activities affecting federal interstate and/or foreign commerce. SL was an "enterprise," as that term is defined pursuant to section 1961(4) of RICO. (18 U.S.C. section 1961(4).) DEFENDANTS owned and operated SL.

12. PLAINTIFF further alleges that the conduct, activity, practices, commissions and/or omissions of DEFENDANTS are attributable and/or ascribable to DEFENDANTS. DEFENDANTS constitute a "person," as defined by section 1961(3) of RICO. (18 U.S.C. section 1961(3).)

13. On or about August 1, 1997, through on or about May 1999, WARD was an employee with SL during which DEFENDANTS made numerous and continuing false representations concerning their ability to legally conduct business on behalf of SL, including the ability to bring SL to an IPO, despite their illegal immigration status.

14. The true names or capacities, whether individual, corporate, associate or otherwise, of defendants DOES 1 to 20, inclusive, are unknown to PLAINTIFF, who therefore sues said defendants by such fictitious names. PLAINTIFF is informed and believes and thereon alleges that each of defendants designated herein as DOE is legally responsible in some manner (as the agent, partner and/or employee of SL, or family member of DEFENDANTS) for the events and happenings herein referred to and in doing the actions mentioned below was acting individually as an agent of DEFENDANT and with the permission and consent of the co-defendants. All actions of each DEFENDANT herein alleged were ratified and approved by the other individual

DEFENDANTS.

## IV. FACTUAL ALLEGATIONS

15. On or about approximately 1980-1985, CHANANA, a citizen of India, entered the United States. During this time, CHANANA married a United States citizen. CHANANA owned and operated a computer company, Complete Computer Care, Inc. ("CCC"), which sold computer hardware and installed it into offices in Southern California.

16. On or about July 1995, DEFENDANTS formed SL and incorporated it with the California Secretary of State.

17. Prior to 1995, GAUBA and TYAGI entered the United States on student visas in order to obtain Master's degrees. GAUBA attended West Virginia University and TYAGI attended Oregon State University. TYAGI and CHANANA were acquaintances while TYAGI attended Oregon State University.

18. Prior to July 1995, CHANANA obtained H-1B visas for GAUBA and TYAGI to permit them to work in the United States, but only for CCC. Ordinarily, H-1B visas require a "specialty occupation," which neither GAUBA nor TYAGI possessed in any capacity with CCC.

19. In violation of United States Penal Code, 18 U.S.C. section 1425, GAUBA and TYAGI never performed duties for CCC.

20. Instead of working for CCC, on or about July 1995, CHANANA, GAUBA and TYAGI founded and incorporated SL with the State of California, headquartered in the City of San Jose, County of Santa Clara.

21. With H-1B visa status, GAUBA and TYAGI were barred from being SL's founders, Chief Executive Officer ("CEO"), or Chairman. GAUBA and TYAGI's central duties with SL were business development and recruiting employees and managing the company as owners. Sales and recruiting positions do not merit H-1B visa status.

22. GAUBA acted in a capacity as the CEO of SL. However, publicly, GAUBA held himself out as "Manager, SAP Practice" in the early stages of the corporation to cover up public knowledge that he was actually a co-founder, owner, and officer of the corporation, which would have been in violation of his H-1B visa. GAUBA interacted regularly with customers and

1 consultants. TYAGI acted in a capacity as the President of SL, interacting regularly with
2 customers and consultants.
3    23.   CHANANA was also a co-founder, acting as Chief Financial Officer ("CFO"). His
4 presence was less visible and he managed financing operations for SL. CHANANA mainly
5 interfaced with the internal accounting and Human Resource groups, and would occasionally meet
6 with SAP to negotiate matters concerning accounts receivables.
7    24.   SL was formed as a firm providing consultants to Systems Applications and
8 Products in Data Processing ("SAP") and customers using SAP's software. SAP is an international
9 German software applications company. A representative sample of SAP clients includes: PG&E,
10 SBC-Pacific Bell, Verizon, Chevron, Sempra Energy, BFI, Shell, Citgo, Hunter-Douglas, Bechtel,
11 American Airlines, Intel, Lockheed Martin, Best Foods, Caterpillar, Bristol-Meyers Squibb, REI,
12 Northrop Grumman, Raytheon, Honeywell, DaimlerChrysler, Apple Computer, Hewlett-Packard,
13 Haliburton, ExxonMobil, and Kodak. In 1995, SAP had successfully penetrated the international
14 market, but had not yet penetrated the United States market, in part because it did not have
15 adequate manpower to implement the software in the United States. SL provided the necessary
16 skilled manpower to implement SAP products.
17    25.   SL never directly employed GAUBA nor TYAGI, never provided W-2's and other
18 tax forms to GAUBA or TYAGI, SL never reported compensation for GAUBA or TYAGI to the
19 Franchise Tax Board ("FTB") or the Internal Revenue Service ("IRS"). As a way of concealing
20 their true employment at SL, and their ownership interests of SL, from the Immigration and
21 Naturalization Service ("INS") (now part of Homeland Security), CCC invoiced SL each month,
22 CCC in turn paid GAUBA and TYAGI's compensation even though GAUBA and TYAGI never
23 worked for CCC and were the CEO and Chairman of SL. Federal immigration law does not
24 permit non-citizens to establish a company and then sponsor themselves for work visas in
25 Defendants' situation. (18 U.S.C. section 1425.) DEFENDANTS perpetuated this fraud on the
26 INS, IRS and FTB in violation of United States Penal Code. (18 USC section 1425.)
27    26.   On or about late 1996, GAUBA and TYAGI each returned to India and got
28 married. GAUBA married Pooja Gauba and TYAGI married Indu Tyagi. Each of their wives

The Epstein Group
Attorneys

could have obtained an H-4 visa for non-working spouses accompanying the holder of an H-1B visa. Instead, GAUBA and TYAGI fraudulently obtained H-1B visas for their wives through SL. Pooja Gauba and Indu Tyagi worked at SL as recruiters and managers. Pooja Gauba and Indu Tyagi' positions with SL are (were) non-specialist positions and do not qualify for H-1B visa status.

27. SL's operations met success. In 1995, SL had sales of $638,000. In 1996, SL had $15.7 million in sales. And, in 1997, SL was named the second fasting growing company in the United States by Entrepreneur Magazine, increasing sales to over $50 million.

28. Despite SL's success, GAUBA, TYAGI, and CHANANA could not sell SL on the publicly traded market. GAUBA, TYAGI, and CHANANA knew that due diligence of outside parties in the investor community surrounding any attempt at an initial public offering would likely expose their immigration fraud and result in destruction of SL, personal financial penalties, imprisonment, and deportation.

29. On or about early 1997, Bob Lee, a partner in the accounting firm Ireland San Filippo, located in San Jose, California, introduced PLAINTIFF to SL. At that time, PLAINTIFF was working in the commercial lending department of Bank of America.

30. On or about February 1997, PLAINTIFF attended a meeting at SL headquarters in San Jose, California. DEFENDANTS attempted to recruit PLAINTIFF away from Bank of America. At the time, DEFENDANTS told PLAINTIFF that the three of them founded, owned, and operated SL in its entirety, each possessing an equal ownership share. GAUBA told PLAINTIFF that SL was a staffing company exclusively staffing SAP consultants.

31. During the period on or about March 1997 to on or about April 1997, PLAINTIFF and DEFENDANTS met several times to discuss the possibility of WARD joining SL in a business development and sales capacity.

32. During the pre-hiring negotiations as an inducement to take the position, DEFENDANTS repeatedly told PLAINTIFF that SL would be sold publicly in an IPO and PLAINTIFF would be on the "ground-floor" and gain substantially. DEFENDANTS told PLAINTIFF that key employees like PLAINTIFF would receive vested stock options in the

The Epstein Group Attorneys

1 upcoming IPO at a future date. DEFENDANTS' recruitment effort paid off with PLAINTIFF agreeing to quit Bank of America and come to work for SL.

33. On or about August 1, 1997, PLAINTIFF began official employment at SL. PLAINTIFF's starting base pay was approximately $30,000 to $35,000 annually, with substantial commission potential.

34. On or about August 1997, when PLAINTIFF started working for SL, SL had a staff of approximately 40-50 employees, as well as several independent contractor consultants.

35. On or about the spring of 1997, DEFENDANTS again obtained another fraudulent H-1B visa. This time, DEFENDANTS obtained a fraudulent H-1B visa for TYAGI'S brother, Rajiv Tyagi. Rajiv Tyagi worked at SL as a recruiter, a non-specialist position that is not supported by an H-1B visa.

36. During the course of PLAINTIFF's employment with SL, DEFENDANTS repeated told PLAINTIFF they intended to sell the company in an IPO. GAUBA repeatedly represented that he was positioning SL for an IPO, and that SL would "take care of [PLAINTIFF]," despite that they did not have good faith intent to ever take the company to IPO, because by doing so they would risk exposure of their illegal immigration status and thus risk financial ruin, imprisonment and deportation.

37. During the period of on or about late 1997 through on or about early 1998, SL began exhibiting signs of tremendous financial growth.

38. During this same period, SL switched to a larger, nationally known and more recognizable accounting firm, Ernst & Young. The company also prepared to sell proprietary software; to engage in remote hosting of SAP systems for small clients; and to embark upon a specialized project implementation plan which would allow SL to bid on entire projects instead of serving in a sub-bidding capacity in larger projects managed by outside firms. DEFENDANTS repeatedly told PLAINTIFF and other key SL employees that the changes were designed to bring SL to market in an IPO.

39. During the period of on or about August 1997 through on or about May 1999, SL grew rapidly to approximately 525 employees.

The Epstein Group
Attorneys

40. On or about fall of 1998, PLAINTIFF's base pay was increased as part of a compensation package for a new position, and his commission structure changed as a result of this new role. As a result of the position change, PLAINTIFF's overall income decreased in response to his commission restructuring.

41. On or about late 1997, GAUBA, TYAGI, and CHANANA asked PLAINTIFF to work in conjunction with the SL software development department to introduce the early sales of the SL proprietary software, in addition to PLAINTIFF's pre-existing consulting and project sales. Nearly all of the initial sales of the SL proprietary software stemmed from deals that PLAINTIFF initiated or otherwise played a part in.

42. On or about the summer of 1998, GAUBA and TYAGI asked WARD to find a replacement for himself in consulting sales, in order to dedicate his full-time efforts to selling the proprietary software, hosting services, and project implementations. At this time, GAUBA, TYAGI, and CHANANA offered PLAINTIFF an increase in base pay and a new commission structure. Although the new payment structure would result in a short or medium term payment decrease for PLAINTIFF, DEFENDANTS represented to PLAINTIFF that these changes would better position SL for an IPO, and that PLAINTIFF would be financially compensated in return in the future, once SL sold at an IPO.

43. During the period of on or about January 1999 through on or about May 1999, PLAINTFF was on pace to earn an income equal to approximately $425,000 on an annualized basis.

44. During PLAINTIFF's employment with SL, numerous recruiters contacted him attempting to recruit him for other positions. PLAINTIFF also received numerous employment inquiries from his business partners and competitors. PLAINTIFF did not pursue any of these opportunities because of the continuous reinforcement from DEFENDANTS that they were moving towards an IPO, and that PLAINTIFF would reap significant financial gain, implying that the stock options could grow in value into the millions of dollars.

45. On or about May 1999, instead of placing SL up for an IPO, DEFENDANTS sold SL to a single purchaser, KPMG International ("KPMG"), for approximately $100 million, without

ever attempting to sell SL at an IPO. PLAINTIFF, GAUBA and TYAGI were all made partners at KPMG.

46. On or about October 2000, PLAINTIFF left his partner position at KPMG in order to spearhead a sales effort in Latin America on behalf of a software company, Commerce One.

47. DEFENDANTS, and each of them, actively sought to conceal the facts alleged herein from the plaintiff and did so successfully until an unknown whistle-blower brought the true facts to the plaintiff's attention. In or about December of 2006, for the first time PLAINTIFF became aware of DEFENDANTS fraudulent and illegal conduct. PLAINTIFF received an anonymous letter, dated November 28, 2006, from New York sent to each of two of his prior addresses in Gilroy, California. The letter informed PLAINTIFF of the following: (1) that GAUBA, CHANANA, and TYAGI fraudulently induced PLAINTIFF to join SL with the promise of an eventual IPO; (2) that SL could not have in good faith completed an IPO because GAUBA and TYAGI were in the country illegally, and the deleterious effect of an IPO would be to place their respective immigration backgrounds into close scrutiny; (3) that CHANANA, TYAGI, and GAUBA had conspired to defraud the government in fraudulently obtaining numerous H-1B visas; and (4) that a background check on the education and employment history of GAUBA and TYAGI could potentially expose the fraud involved in establishing and growing SL.

## V. PLAINTIFF'S CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF 18 U.S.C. SECTION 1962(C)

### OPERATION OF ENTERPRISE THROUGH RACKETEERING ACTIVITY

As a separate and distinct claim for relief, PLAINTIFF brings his First Cause of Action against DEFENDANTS claiming that DEFENDANTS violated 18 U.S.C. section 1962(c), such that PLAINTIFF is entitled to treble damages, by alleging the following:

48. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

49. PLAINTIFF alleges that DEFENDANTS were employed by and associated with each other, and engaged in conduct that constitutes a RICO pattern of racketeering activity.

50. PLAINTIFF alleges that each of the following configurations constitute a RICO "enterprise," as that term is defined pursuant to 18 U.S.C. section 1961(4).

51. At all material times herein, SL was a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, and/or representatives that formulate and implement policies relative to the provision of SAP consulting services to clientele and customers, both domestically and internationally. PLAINTIFF alleges that RICO persons GAUBA, TYAGI, CHANANA, and persons acting in concert therewith, were employed by and associated with said RICO enterprise that was at all material times herein engaged in, or activities of which affected, interstate or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conducted or participated, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

52. DEFENDANTS engaged in "racketeering activity" within the meaning of 18 U.S.C. section 1961(1) by engaging in the acts set forth above, aiding and abetting the commission of the foregoing acts, and/or conspiring to commit the foregoing acts, in violation of 18 U.S.C. section 1425 relating to the procurement of citizenship or naturalization unlawfully.

53. PLAINTIFF alleges that the aforementioned activities and/or conduct engaged in by defendants constituted a "pattern of racketeering activity," as that term is defined in 18 U.S.C. section 61(5). PLAINTIFF further alleges that the activities and/or conduct engaged in by defendants were both related as to the modus operandi engaged in by said defendants of depriving PLAINTIFF of money, and was continuous inasmuch as the activities and/or conduct engaged in by DEFENDANTS exhibited a realistic, long term threat of continued future injury to PLAINTIFF's interest in his business and/or property.

54. PLAINTIFF sustained damages and/or injuries to his interests in business and/or property as a result of DEFENDANTS' activities and/or conduct, in an amount according to proof. PLAINTIFF is entitled to recover compensatory damages, said sum to be trebled, in an amount according to proof. PLAINTIFF is also entitled to recover punitive damages, exemplary damages, attorneys' fees, costs, and prejudgment interest.

55. DEFENDANTS are conspiratorially liable under the application of the Pinkerton doctrine (Pinkerton v. U.S, 328 U.S. 640 (1946); Salinas v. U.S., 522 U.S. 52 (1997)) inasmuch as (1) DEFENDANTS engaged in the fraudulent or extortionate activities that constitute the RICO pattern of racketeering activity; (2) defendants are members of the RICO conspiracy designed and intended to contravene RICO section 1962, subdivisions (a) and (c); (3) DEFENDANTS engaged in activities in furtherance of advancing and promoting the RICO conspiracy designed and intended to contravene RICO section1962, subdivisions (a) and (c); (4) DEFENDANTS were members of the RICO conspiracy at and during the time frame the fraudulent and extortionate activities were committed that constitute the RICO pattern of racketeering activity; and (5) the offense fell within scope of the unlawful agreement and could reasonably have been foreseen to be necessary or natural consequence of the unlawful agreement.

56. WHEREFORE, PLAINTIFF requests relief as hereinafter provided.

## SECOND CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION

As a separate and distinct claim for relief, PLAINTIFF brings his Second Cause of Action against DEFENDANTS claiming that DEFENDANTS intentionally misrepresented facts that caused harm to PLAINTIFF.

57. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

58. DEFENDANTS repeatedly told PLAINTIFF that they intended to sell SL at an IPO and that he would be compensated significantly once the IPO occurred.

59. DEFENDANTS' representation that they intended to sell SL at an IPO was false each and every time DEFENDANTS made the representations.

60. DEFENDANTS knew that the representation was false when they made it, or that they made the representation recklessly and without regard for the truth.

61. DEFENDANTS intended that PLAINTIFF would rely on the representations.

62. PLAINTIFF did reasonably rely on DEFENDANTS' false representations.

63. As a direct and proximate result of relying on DEFENDANTS' false

representations, PLAINTIFF suffered harm.

64. PLAINTIFF's reliance on DEFENDANTS' representations was a substantial factor causing PLAINTIFF's harm.

65. Wherefore, PLAINTIFF requests relief as herein provided.

### THIRD CAUSE OF ACTION

### CONCEALMENT

As a separate and distinct claim for relief, PLAINTIFF brings his Third Cause of Action against DEFENDANTS claiming that he was harmed because DEFENDANTS concealed the fact that GAUBA and TYAGI were in the United States illegally and thus SL could not be sold at an IPO.

66. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

67. PLAINTIFF and DEFENDANTS were in a business relationship.

68. DEFENDANTS intentionally failed to disclose that GAUBA and TYAGI were in the United States illegally and thus SL could not be sold at an IPO.

69. DEFENDANTS actively concealed the above fact from PLAINTIFF.

70. PLAINTIFF did not know the concealed fact.

71. DEFENDANTS intended to deceive PLAINTIFF by concealing the fact.

72. PLAINTIFF reasonably relied on the DEFENDANTS' concealment of the fact.

73. PLAINTIFF was harmed and DEFENDANTS' concealment was a substantial factor in causing PLAINTIFF's harm.

74. Wherefore, PLAINTIFF requests relief as herein provided.

### FOURTH CAUSE OF ACTION

### FALSE PROMISE

As a separate and distinct claim for relief, PLAINTIFF brings his Fourth Cause of Action against DEFENDANTS claiming that PLAINTIFF was harmed because DEFENDANTS made a false promise to PLAINTIFF.

75. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if

set forth here in full.

76. DEFENDANT made a promise to PLAINTIFF that SL would be sold at IPO and PLAINTIFF would receive equity shares and make substantial financial gains.

77. The above referenced promise was important to PLAINTIFF's decision to work for SL and continue working for SL.

78. At the time the promises were made, DEFENDANTS did not intend to perform on the promise.

79. PLAINTIFF reasonably relied on DEFENDANTS' promise.

80. DEFENDANTS did not perform the promised act.

81. PLAINTIFF was harmed and PLAINTIFF's reliance on DEFENDANTS' promise was a substantial factor in causing PLAINTIFF's harm.

82. Wherefore, PLAINTIFF requests relief as herein provided.

### FIFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

As a separate and distinct claim for relief, PLAINTIFF brings his Fifth Cause of Action against DEFENDANTS claiming that PLAINTIFF was harmed because DEFENDANTS negligently misrepresented important facts.

83. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

84. DEFENDANTS repeatedly told PLAINTIFF that they intended to sell SL at an IPO and that he would be compensated significantly once the IPO occurred.

85. DEFENDANTS' representation that they intended to sell SL at an IPO was false each and every time DEFENDANTS made the representations.

86. DEFENDANTS' representations were false.

87. DEFENDANTS had no reasonable grounds to believe the representation was true when DEFENDANTS made the representation.

88. PLAINTIFF reasonably relied on DEFENDANTS representations.

89. As a direct and proximate result of relying on DEFENDANTS' false

1  representations, PLAINTIFF suffered harm.

2      90.    PLAINTIFF's reliance on DEFENDANTS' representations was a substantial factor in causing PLAINTIFF's harm.

4      91.    Wherefore, PLAINTIFF requests relief as herein provided.

## SIXTH CAUSE OF ACTION

## CONSPIRACY

7  As a separate and distinct claim for relief, PLAINTIFF brings his Sixth Cause of Action against DEFENDANTS claiming that PLAINTIFF was harmed because DEFENDANTS engaged in conspiracy to commit fraud against the INS, fraud against PLAINTIFF, intentional misrepresentation against PLAINTIFF, concealment against PLAINTIFF, and false promise against PLAINTIFF.

12      92.    PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

14      93.    Each DEFENDANT was aware that each other DEFENDANT planned to commit fraud against the INS, fraud against PLAINTIFF, intentional misrepresentation against PLAINTIFF, concealment against PLAINTIFF, and false promise against PLAINTIFF.

17      94.    Each DEFENDANT agreed with each other DEFENDANT and intended that the fraud against the INS, fraud against PLAINTIFF, intentional misrepresentation against PLAINTIFF, concealment against PLAINTIFF, and false promise against PLAINTIFF be committed.

21      95.    Wherefore, PLAINTIFF requests relief as herein provided.

## VI. PRAYER FOR RELIEF

23  WHEREFORE, WARD prays for judgment and other relief, as follows:

24      1.    For a declaration of the rights and liabilities of the parties;

25      2.    For an order pursuant to 18 U.S.C. section 1964(a) prohibiting DEFENDANTS from engaging in their illegal racketeering conduct;

27      3.    For compensatory damages, said sum to be trebled pursuant to 18 U.S.C. section 1964(c);

| | | |
|---|---|---|
|1| 4. | For punitive and exemplary damages according to proof; |
|2| 5. | For prejudgment and post-judgment interest; |
|3| 6. | For reasonable attorney's fees pursuant to 18 U.S.C. section 1964(c); |
|4| 7. | For costs of suit incurred herein; |
|5| 8. | For such other and further relief as the court deem proper. |

**PLAINTIFF'S DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury of all matters plead in his complaint.

December 12, 2007

THE EPSTEIN GROUP
Attorneys & Counselors at Law


By:_____
MARK EPSTEIN, Attorneys for
JAMES WARD

4. For punitive and exemplary damages according to proof;
5. For prejudgment and post-judgment interest;
6. For reasonable attorney's fees pursuant to 18 U.S.C. section 1964(c);
7. For costs of suit incurred herein;
8. For such other and further relief as the court deem proper.

### PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury of all matters plead in his complaint.

December 12, 2007

THE EPSTEIN GROUP
Attorneys & Counselors at Law

By: _____
MARK EPSTEIN, Attorneys for
JAMES WARD

Complaint