**Mark Epstein, Esq.** SBN: 159801
**Julia M. Adams, Esq.** SBN: 230795
**Jessica L. Chylik, Esq.** SBN: 201127
THE EPSTEIN GROUP
ATTORNEYS & COUNSELORS AT LAW
2358 Market Street, Third Floor
San Francisco, California 94114
Telephone (415) 863-5718
Facsimile (415) 863-8719
e-mail: mepstein@epsteingroup.com

Attorneys for Plaintiff
JAMES WARD

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WARD,<br><br>Plaintiff,<br><br>vs.<br><br>NAVEEN CHANANA, SANJEEV TYAGI, GAURAV GAUBA, and DOE 1 through DOE 20, inclusive<br><br>Defendants. | CASE NO. **CV 07 06290 JW**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**<br><br>**1. RICO Violation;**<br>**2. Intentional Misrepresentation;**<br>**3. Concealment;**<br>**4. False Promise; and,**<br>**5. Negligent Misrepresentation.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff James Ward ("PLAINTIFF") alleges and complains against defendants, and each and every one of them, as follows:

1. PLAINTIFF is an individual and is currently a citizen and resident of the State of Rhode Island. At all times relevant herein, Plaintiff was a citizen and resident of the State of California.

## I. JURISDICTION

2. Defendant Naveen Chanana ("CHANANA") is an individual and is, and at all times relevant herein was, a citizen and resident of the State of California.

3. Defendant Sanjeev Tyagi ("TYAGI") is an individual and is, and at all times relevant herein was, a citizen and resident of the State of California.

The Epstein Group
Attorneys

4. Defendant Gaurav Gauba ("GAUBA") is an individual and is, and at all times relevant herein was, a citizen and resident of the State of California.

5. The true names or capacities, whether individual, corporate, associate or otherwise, of defendants DOES 1 to 20, inclusive, are unknown to PLAINTIFF, who therefore sues said defendants by such fictitious names. PLAINTIFF is informed and believes and thereon alleges that each of defendants designated herein as DOE is legally responsible in some manner (as the agent, partner and/or employee of Softline Consulting & Integrators, Inc. ("Softline"), or family member of CHANANA, TYAGI, and/or GAUBA or other Defendants) for the events and happenings herein referred to and in doing the actions mentioned below was acting individually as an agent of one or more Defendants and with the permission and consent of the co-defendants. All actions of each and every Defendant, including Doe Defendants, herein alleged were ratified and approved by the other individual Defendants.

6. This Court has subject matter jurisdiction of this case on the basis of federal question jurisdiction by virtue of PLAINTIFF's allegations that one or more Defendants, including Doe Defendants, violated Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961 *et seq.*

7. This Court has subject matter jurisdiction on the basis of diversity of the parties. PLAINTIFF is currently a citizen and resident of the State of Rhode Island. CHANANA, TYAGI, and GAUBA are residents of the State of California. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## II. VENUE

8. This Court is the proper venue on the basis that a substantial part of the events and omissions giving rise to this claim occurred in this District.

## III. FACTUAL ALLEGATIONS

9. In or about approximately 1980-1985, CHANANA, a citizen of India, entered the United States. During this time, CHANANA married a United States citizen. CHANANA owned and operated a computer company, Complete Computer Care, Inc. ("CCC"), which sold computer hardware and installed it into offices in Southern California.

10. Prior to 1995, GAUBA and TYAGI entered the United States on student visas in order to obtain Master's degrees. GAUBA attended West Virginia University and TYAGI attended Oregon State University. TYAGI and CHANANA were acquaintances while TYAGI attended Oregon State University.

11. Prior to July 1995, CHANANA obtained H-1B visas for GAUBA and TYAGI to permit them to work in the United States, but only for CCC. Ordinarily, H-1B visas require a "specialty occupation," which neither GAUBA nor TYAGI possessed in any capacity with CCC.

12. In violation of United States Penal Code, 18 U.S.C. §1425, GAUBA and TYAGI never performed duties for CCC.

13. On or about July 1995, CHANANA, TYAGI, and GAUBA formed Softline and incorporated it with the California Secretary of State. Softline was headquartered in the City of San Jose, County of Santa Clara.

14. Instead of working for CCC, GAUBA and TYAGI ran Softline even though persons holding H-1B visa status are barred from being founders, owners or officers of corporations. GAUBA and TYAGI's central duties with Softline were business development and recruiting employees and managing the company as owners. Sales and recruiting positions do not merit H-1B visa status.

15. Even though GAUBA held himself out as "Manager, SAP Practice" in the early stages of the corporation, GAUBA actually acted in a capacity as the Chief Executive Officer ("CEO") of Softline, in violation of his H-1B visa. GAUBA interacted regularly with customers and consultants. TYAGI acted in a capacity as the President of Softline, interacting regularly with customers and consultants.

16. CHANANA was also a co-founder of Softline, acting as Chief Financial Officer ("CFO"). His presence was less visible and he managed financing operations for Softline. CHANANA mainly interfaced with the internal accounting and Human Resource groups, and would occasionally meet with Systems Applications and Products in Data Processing ("SAP"), an international German software applications company, to negotiate matters concerning accounts receivables.



17. Softline provided consultants to SAP and customers using SAP's software. A representative sample of SAP clients includes: PG&E, SBC-Pacific Bell, Verizon, Chevron, Sempra Energy, BFI, Shell, Citgo, Hunter-Douglas, Bechtel, American Airlines, Intel, Lockheed Martin, Best Foods, Caterpillar, Bristol-Meyers Squibb, REI, Northrop Grumman, Raytheon, Honeywell, Daimler-Chrysler, Apple Computer, Hewlett-Packard, Haliburton, ExxonMobil, and Kodak. In 1995, SAP had successfully penetrated the international market, but had not yet penetrated the United States market, in part because it did not have adequate manpower to implement the software in the United States. Softline provided the necessary skilled manpower to implement SAP products.

18. CHANANA, GAUBA and TYAGI concealed the fact that they owned and ran Softline from the public and from the Immigration and Naturalization Service ("INS") (now part of Homeland Security). Softline never directly employed GAUBA nor TYAGI, never provided W-2's and other tax forms to GAUBA or TYAGI, and never reported compensation for GAUBA or TYAGI to the California Franchise Tax Board or the Internal Revenue Service ("IRS"). Instead, CCC invoiced Softline each month, and CCC in turn paid GAUBA and TYAGI's compensation even though GAUBA and TYAGI never worked for CCC and were the CEO and President of Softline. Thus, CHANANA, GAUBA and TYAGI established a company which sponsored GAUBA and TYAGI for work visas, in violation of federal law.

19. On or about late 1996, GAUBA and TYAGI each returned to India and got married. GAUBA married Pooja Gauba and TYAGI married Indu Tyagi. Each of their wives could have obtained an H-4 visa for non-working spouses accompanying the holder of an H-1B visa. Instead, GAUBA and TYAGI fraudulently obtained H-1B visas for their wives through Softline. Pooja Gauba and Indu Tyagi worked at Softline as recruiters and managers. Pooja Gauba and Indu Tyagi' positions with Softline were non-specialist positions which do not qualify for H-1B visa status.

20. Softline's operations met success. In 1995, Softline had sales of $638,000. In 1996, Softline had $15.7 million in sales. And, in 1997, Softline was named the second fastest

///


The Epstein Group
Attorneys

growing company in the United States by Entrepreneur Magazine, increasing sales to over $50 million.

21. Despite Softline's success, GAUBA, TYAGI, and CHANANA could not sell Softline on the publicly traded market because they knew that due diligence of outside parties in the investor community surrounding any attempt at an initial public offering would likely expose their immigration fraud and result in destruction of Softline, personal financial penalties, imprisonment, and deportation.

22. In or about early 1997, Bob Lee, a partner in the accounting firm Ireland San Filippo, located in San Jose, California, introduced PLAINTIFF to Softline. At that time, PLAINTIFF was working in the commercial lending department of Bank of America.

23. In or about February 1997, PLAINTIFF attended a meeting at Softline headquarters in San Jose, California. CHANANA, GAUBA and TYAGI attempted to recruit PLAINTIFF away from Bank of America. At the time, CHANANA, GAUBA and TYAGI told PLAINTIFF that the three of them founded, owned, and operated Softline in its entirety, each possessing an equal ownership share. GAUBA told PLAINTFF that Softline was a staffing company exclusively staffing SAP consultants.

24. During the period on or about March 1997 to on or about April 1997, PLAINTIFF met with CHANANA, GAUBA, and/or TYAGI several times to discuss the possibility of PLAINTIFF joining Softline in a business development and sales capacity. During the pre-hiring negotiations as an inducement to take the position, CHANANA, GAUBA, and/or TYAGI, individually and together, repeatedly told PLAINTIFF that Softline would be sold publicly in an initial public offering and PLAINTIFF would be on the "ground-floor" and gain substantially. CHANANA, GAUBA, and/or TYAGI, individually and together, told PLAINTIFF that key employees like PLAINTIFF would receive vested stock options in the upcoming initial public offering at a future date. The recruitment effort paid off with PLAINTIFF agreeing to quit Bank of America and come to work for Softline.

///

///



The Epstein Group
Attorneys

25. On or about August 1, 1997, PLAINTIFF began official employment at Softline. PLAINTIFF's starting base pay was approximately $30,000 to $35,000 annually, with substantial commission potential.

26. On or about August 1997, when PLAINTIFF started working for Softline, Softline had a staff of approximately 40-50 employees, as well as several independent contractor consultants.

27. In or about the spring of 1997, Defendants, including Doe Defendants, and each of them, again obtained another fraudulent H-1B visa, this time for TYAGI's brother, Rajiv Tyagi. Rajiv Tyagi worked at Softline as a recruiter, a non-specialist position that is not supported by an H-1B visa.

28. During the course of PLAINTIFF's employment with Softline, CHANANA, GAUBA, and/or TYAGI, individually and together, repeatedly told PLAINTIFF they intended to sell the company in an initial public offering. GAUBA repeatedly represented that he was positioning Softline for an initial public offering, and that Softline would "take care of [PLAINTIFF]," despite the fact that Defendants, including Doe Defendants, and each of them, did not have good faith intent to ever take the company to initial public offering, because by doing so they would risk exposure of the illegal immigration status of GAUBA and TYAGI and others and thus would risk financial ruin, imprisonment and deportation.

29. During the period of approximately late 1997 through approximately early 1998, Softline began exhibiting signs of tremendous financial growth. During this same period, Softline switched to a larger, nationally known and more recognizable accounting firm, Ernst & Young. The company also prepared to sell proprietary software; to engage in remote hosting of SAP systems for small clients; and to embark upon a specialized project implementation plan which would allow Softline to bid on entire projects instead of serving in a sub-bidding capacity in larger projects managed by outside firms. CHANANA, GAUBA, and/or TYAGI, individually and together, repeatedly told PLAINTIFF and other key Softline employees that the changes were designed to bring Softline to market in an initial public offering.

///

The Epstein Group
Attorneys

30. In approximately late 1997, GAUBA, TYAGI, and CHANANA asked PLAINTIFF to work in conjunction with the Softline software development department to introduce the early sales of the Softline proprietary software, in addition to PLAINTIFF's pre-existing consulting and project sales. Nearly all of the initial sales of the Softline proprietary software stemmed from deals that PLAINTIFF initiated or otherwise played a part in.

31. In approximately the summer of 1998, GAUBA and TYAGI asked PLAINTIFF to find a replacement for himself in consulting sales, in order to dedicate his full-time efforts to selling the proprietary software, hosting services, and project implementations. At this time, GAUBA, TYAGI, and CHANANA offered PLAINTIFF an increase in base pay and a new commission structure. Although the new compensation structure would result in a short or medium term compensation <u>decrease</u> for PLAINTIFF, CHANANA, GAUBA, and/or TYAGI, individually and together, represented to PLAINTIFF that these changes would better position Softline for an initial public offering, and that PLAINTIFF would be financially compensated in return in the future, once Softline sold at an initial public offering. PLAINTIFF would not have agreed to the decrease in compensation without the assurances that an initial public offering would be made.

32. In approximately fall of 1998, PLAINTIFF's base compensation was increased as part of a compensation package for a new position, and his commission structure changed as a result of this new role. As a result of the position change, PLAINTIFF's overall income <u>decreased</u> in response to his commission restructuring. PLAINTIFF would not have agreed to this decrease in compensation without the assurances than an initial public offering would be made.

33. From approximately January 1999 through approximately May 1999, PLAINTFF was on pace to earn an income equal to approximately $425,000 on an annualized basis.

34. By May 1999, Softline had grown rapidly to approximately 525 employees.

35. During PLAINTIFF's employment with Softline, numerous recruiters contacted him attempting to recruit him for other positions. PLAINTIFF also received numerous employment inquiries from his business partners and competitors. PLAINTIFF did not pursue

any of these opportunities because of the continuous reinforcement from Defendants, including Doe Defendants, and each of them, that they were moving toward an initial public offering, and that PLAINTIFF would reap significant financial gain, implying that the stock options could grow in value into the millions of dollars.

36. In approximately May 1999, instead of placing Softline up for an initial public offering, DEFENDANTS sold Softline to a single purchaser, KPMG International ("KPMG"), for approximately $100 million, without ever attempting to sell Softline shares at an initial public offering. PLAINTIFF, GAUBA and TYAGI were all made partners at KPMG. PLAINTIFF's position at KPMG was less lucrative for him than an initial public offering of Softline stock would have been, and the compensation package at KPMG was a decrease from what PLAINTIFF had been earning at Softline. PLAINTIFF left his partner position at KPMG in approximately October 2000 in order to spearhead a sales effort in Latin America on behalf of a software company, Commerce One.

37. On or about December of 2006, for the first time PLAINTIFF learned that Defendants, including Doe Defendants, and each of them, never intended to take Softline to an initial public offering because of GAUBA and TYAGI's illegal immigration status and the improper H-1B visas obtained for others through Softline and/or CCC. Until that time, PLAINTIFF believed that the failure of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, to take Softline to an initial public offering was a business decision based solely on factors other than the illegal immigration status of its founders, owners, and officers.

## IV. PLAINTIFF'S CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of 18 U.S.C. SECTION 1962(c))

### Operation of Enterprise through Racketeering Activity

As a separate and distinct claim for relief, PLAINTIFF brings his First Cause of Action against all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI,

///

including Doe Defendants, and each of them, claiming that they, and each of them, violated 18 U.S.C. §1962(c), such that PLAINTIFF is entitled to treble damages, by alleging the following:

38. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

39. PLAINTIFF currently is a citizen and resident of Rhode Island and at all times material herein, was a citizen and resident of the State of California. PLAINTIFF was engaged in activities affecting federal interstate and/or foreign commerce. PLAINTIFF is a "person," as that term is defined pursuant to 18 U.S.C. §1961(3).

40. PLAINTIFF is informed and believes, and thereon alleges, that Softline is and at all times material herein was, a corporation created and organized pursuant to the California Corporations Code, maintaining its principal place of business within the City of San Jose, County of Santa Clara, State of California. Softline at all times material herein was engaged in activities affecting federal interstate and/or foreign commerce. Softline was an "enterprise," as that term is defined pursuant to 18 U.S.C. §1961(4). Defendants, including but not limited to CHANANA, GAUBA and/or TYAGI, and including Doe Defendants, and each of them, owned and operated Softline.

41. PLAINTIFF is informed and believes, and thereon alleges, that the conduct, activity, practices, commissions and/or omissions of Defendants, including but not limited to CHANANA, GAUBA and/or TYAGI, and including Doe Defendants, and each of them, are attributable and/or ascribable to them. CHANANA, GAUBA and TYAGI each constitute a "person," as defined by 18 U.S.C. section 1961(3).

42. PLAINTIFF is informed and believes, and thereon alleges, that from approximately August 1, 1997 through approximately May 1999, PLAINTIFF was an employee with Softline during which time CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, made numerous and continuing false representations concerning their ability to legally conduct business on behalf of Softline, including the ability to bring Softline to an initial public offering, while concealing their illegal immigration status.



43. PLAINTIFF is informed and believes, and thereon alleges, that CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, were employed by and associated with each other, and engaged in conduct that constitutes a RICO pattern of racketeering activity.

44. PLAINTIFF is informed and believes, and thereon alleges, that each of the following configurations constitute a RICO "enterprise," as that term is defined pursuant to 18 U.S.C. §1961(4).

45. At all material times herein, Softline was a RICO enterprise, organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, and/or representatives that formulate and implement policies relative to the provision of SAP consulting services to clientele and customers, both domestically and internationally. PLAINTIFF alleges that RICO persons GAUBA, TYAGI, CHANANA, and persons acting in concert therewith, were employed by and associated with said RICO enterprise that was at all material times herein engaged in, or activities of which affected, interstate or foreign commerce, and that said RICO persons, and persons acting in concert therewith, conducted or participated, directly or indirectly, in the conduct of such RICO enterprise's affairs through a RICO pattern of racketeering activity.

46. PLAINTIFF is informed and believes, and thereon alleges, that CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1) by engaging in the acts set forth above, aiding and abetting the commission of the foregoing acts, and/or conspiring to commit the foregoing acts, in violation of 18 U.S.C. §1425 relating to the unlawful procurement of employment visas, citizenship, or naturalization.

47. PLAINTIFF is informed and believes, and thereon alleges, that the aforementioned activities and/or conduct engaged in by CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, constituted a "pattern of racketeering activity," as that term is defined in 18 U.S.C. §1961(5). PLAINTIFF is further informed and believes, and thereon alleges, that the activities and/or conduct engaged in by


The Epstein Group
Attorneys

CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, were both related as to the modus operandi engaged in by said Defendants of depriving PLAINTIFF of money, and was continuous inasmuch as the activities and/or conduct engaged in by CHANANA, GAUBA, and/or TYAGI and other Defendants, including Doe Defendants, and each of them, exhibited a realistic, long term threat of continued future injury to PLAINTIFF's interest in his business and/or property.

48. PLAINTIFF sustained damages and/or injuries to his interests in business and/or property as a result of the activities and/or conduct of CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, in an amount according to proof. PLAINTIFF is entitled to recover compensatory damages, said sum to be trebled, in an amount according to proof. PLAINTIFF is also entitled to recover punitive damages, exemplary damages, attorneys' fees, costs, and prejudgment interest.

49. CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, are conspiratorially liable under the application of the *Pinkerton* doctrine (*Pinkerton v. U.S,* 328 U.S. 640 (1946); *Salinas v. U.S.*, 522 U.S. 52 (1997)) inasmuch as (1) CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, engaged in the fraudulent or extortionate activities that constitute the RICO pattern of racketeering activity; (2) CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, are members of the RICO conspiracy designed and intended to contravene 18 U.S.C. §1962(a),(c); (3) CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, engaged in activities in furtherance of advancing and promoting the RICO conspiracy designed and intended to contravene 18 U.S.C. §1962(a),(c); (4) CHANANA, GAUBA, and/or TYAGI, and other Defendants, including Doe Defendants, and each of them, were members of the RICO conspiracy at and during the time frame the fraudulent and extortionate activities were committed that

///

///

///



constitute the RICO pattern of racketeering activity; and (5) the offense fell within scope of the unlawful agreement and could reasonably have been foreseen to be necessary or natural consequence of the unlawful agreement.

50. WHEREFORE, PLAINTIFF requests relief as hereinafter provided.

**SECOND CAUSE OF ACTION**

**Intentional Misrepresentation**

As a separate and distinct claim for relief, PLAINTIFF brings his Second Cause of Action against all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, claiming that they, and each of them, intentionally misrepresented facts that caused harm to PLAINTIFF.

51. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

52. In or about February 1997 and thereafter, all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to induce PLAINTIFF to work for Softline and to take various compensation decreases by assuring PLAINTIFF that they would take Softline to an initial public offering when, in fact, they knew that GAUBA's and TYAGI's illegal immigration status prevented them from doing so.

53. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, repeatedly told PLAINTIFF that they intended to sell Softline at an initial public offering and that PLAINTIFF would be compensated significantly once the initial public offering occurred.

54. The representation of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, that they intended to sell Softline at an initial public offering was false each and every time Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, made the representations.

///

55. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, knew that the representation was false when they made it, or that they made the representation with reckless disregard for the truth.

56. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, intended that PLAINTIFF would rely on the representations.

57. PLAINTIFF did reasonably rely on the false representations of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them.

58. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

59. As a direct and proximate result of relying on said false representations and the wrongful acts herein alleged, PLAINTIFF suffered harm including but not limited to compensation decreases, lost business opportunities, and/or other compensation, in an amount in excess of this Court's jurisdiction, to be proven at trial.

60. PLAINTIFF's reliance on the representations of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, was a substantial factor causing PLAINTIFF's harm.

61. Wherefore, PLAINTIFF requests relief as herein provided.

**THIRD CAUSE OF ACTION**

**Concealment**

As a separate and distinct claim for relief, PLAINTIFF brings his Third Cause of Action against all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, claiming that he was harmed because they, and each of them, concealed the fact that GAUBA and TYAGI were in the United States illegally and thus Softline could not be sold at an initial public offering.

///



62. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

63. In or about February 1997 and thereafter, all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to conceal GAUBA's and/or TYAGI's illegal immigration status in order to induce PLAINTIFF to work for Softline and to take various compensation decreases by making promises of a future initial public offering.

64. PLAINTIFF and Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, were in a business relationship.

65. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, intentionally failed to disclose that GAUBA and/or TYAGI were in the United States illegally and thus Softline could not be sold at an initial public offering.

66. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, actively concealed the above facts from PLAINTIFF.

67. PLAINTIFF did not know the concealed facts.

68. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, intended to deceive PLAINTIFF by concealing the facts.

69. PLAINTIFF reasonably relied on the concealment of the facts by Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them.

70. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

71. As a direct and proximate result of relying on the concealment of the facts and the wrongful acts herein alleged, PLAINTIFF suffered harm including but not limited to



compensation decreases, lost business opportunities, and/or other compensation, in an amount in excess of this Court's jurisdiction, to be proven at trial

72. PLAINTIFF's reliance on the concealment of the facts by Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, was a substantial factor causing PLAINTIFF's harm.

73. Wherefore, PLAINTIFF requests relief as herein provided.

**FOURTH CAUSE OF ACTION**

**False Promise**

As a separate and distinct claim for relief, PLAINTIFF brings his Fourth Cause of Action against all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, claiming that PLAINTIFF was harmed because they, and each of them, made a false promise to PLAINTIFF.

74. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

75. In or about February 1997 and thereafter, all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to promise falsely to take Softline to an initial public offering and PLAINTIFF would receive equity shares so that he would make substantial financial gains, in order to induce PLAINTIFF to work for Softline and to take various compensation decreases based on those false promises when, in fact, they knew that GAUBA's and TYAGI's immigration status prevented them from doing so.

76. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, made a promise to PLAINTIFF that Softline would be sold at initial public offering and PLAINTIFF would receive equity shares and make substantial financial gains.

77. The above referenced promise was important to PLAINTIFF's decision to accept employment with Softline, to continue working for Softline, and to take compensation decreases.

///

The Epstein Group
Attorneys

78. At the time the promises were made, Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did not intend to perform on the promises.

79. PLAINTIFF reasonably relied on the promises of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them.

80. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did not perform the promised acts.

81. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

82. As a direct and proximate result of relying on the false promises made by Defendants and the wrongful acts herein alleged, PLAINTIFF suffered harm including but not limited to compensation decreases, lost business opportunities, and/or other compensation, in an amount in excess of this Court's jurisdiction, to be proven at trial

83. PLAINTIFF's reliance on the false promises by Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, was a substantial factor causing PLAINTIFF's harm.

84. Wherefore, PLAINTIFF requests relief as herein provided.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

As a separate and distinct claim for relief, PLAINTIFF brings his Fifth Cause of Action against all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, claiming that PLAINTIFF was harmed because they, and each of them, negligently misrepresented important facts.

85. PLAINTIFF realleges and incorporates by reference all the above paragraphs as if set forth here in full.

86. In or about February 1997 and thereafter, all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, knowingly

and willfully conspired and agreed among themselves to induce PLAINTIFF to work for Softline and to take various compensation decreases by assuring PLAINTIFF that they would take Softline to an initial public offering when, in fact, they knew that GAUBA's and TYAGI's immigration status prevented them from doing so.

87. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, repeatedly told PLAINTIFF that they intended to sell Softline at an initial public offering and that PLAINTIFF would be compensated significantly once the initial public offering occurred.

88. The representation of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, that they intended to sell Softline at an initial public offering was false each and every time they made the representations.

89. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, had no reasonable grounds to believe the representation was true when they made the representations.

90. PLAINTIFF reasonably relied on the representations of Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them.

91. Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

92. As a direct and proximate result of relying on the misrepresentation of important facts and the wrongful acts herein alleged, PLAINTIFF suffered harm including but not limited to compensation decreases, lost business opportunities, and/or other compensation, in an amount in excess of this Court's jurisdiction, to be proven at trial

93. PLAINTIFF's reliance on the misrepresentations of important facts by Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, was a substantial factor causing PLAINTIFF's harm.

94. Wherefore, PLAINTIFF requests relief as herein provided.

///

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Ward prays for judgment and other relief, as follows:

1. For an order pursuant to 18 U.S.C. §1964(a) ordering all Defendants, including but not limited to CHANANA, GAUBA, and TYAGI, including Doe Defendants, and each of them, from engaging in their illegal racketeering conduct;

2. For compensatory damages, said sum to be trebled pursuant to 18 U.S.C. §1964(c);

3. For punitive and exemplary damages;

4. For prejudgment and post-judgment interest;

5. For reasonable attorney's fees pursuant to 18 U.S.C. §1964(c);

6. For costs of suit incurred herein;

7. For such other and further relief as the court deem proper.

DATED: June 2, 2008

THE EPSTEIN GROUP
Attorneys & Counselors at Law

By:______________________
MARK EPSTEIN
JULIA M. ADAMS
JESSICA L. CHYLIK
Attorneys for Plaintiff JAMES WARD

## DEMAND FOR JURY TRIAL

Plaintiff James Ward hereby demands a trial by jury in this action.

DATED: June 2, 2008

THE EPSTEIN GROUP
Attorneys & Counselors at Law

By:______________________
MARK EPSTEIN
JULIA M. ADAMS
JESSICA L. CHYLIK
Attorneys for Plaintiff JAMES WARD

The Epstein Group
Attorneys